UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| | : CASE NO.: 1:24-cr-00190-1 |
| v. | : |
| | : |
| RICHARD BRENDAN GLOBENSKY, | : |
| | : |
| Defendant. | : |

## DEFENDANT'S POSITION PAPER

Pursuant to the Local Rule 32.1, Defendant Richard Brendan Globensky hereby respectfully submits this Position Paper addressing the Presentence Investigation Report and to assist the Court in determining a reasonable sentence that is "sufficient, but not greater than necessary," under 18 U.S.C. § 3553(a).

## INTRODUCTION

Mr. Globensky comes before this Court for sentencing after pleading guilty to a federal theft offense. Mr. Globensky's offense was serious—while working in the warehouse at Augusta National Golf Club, a private golf club that hosts the annual Master's Tournament, Mr. Globensky stole merchandise and memorabilia from the warehouse and sold it, over the course of a decade, for millions of dollars. Mr. Globensky was able to avoid detection because he took only quantities of merchandise that he knew would not sell out during the tournament or were otherwise slated to be destroyed as surplus. Mr. Globensky also took and resold golf memorabilia relating to Augusta National and the Master's Tournament.

1

Like every other defendant to come before this Court for sentencing, there is so much more to Mr. Globensky than his offense, and this Court will no doubt consider Mr. Globensky's background and history in determining an appropriate sentence. What sets Mr. Globensky apart from most other defendants, however, are the extraordinary lengths he has gone to show remorse for his conduct, fulfill his potential for redemption, and provide restitution for his offense. That includes his extensive cooperation in the Government's related investigations, the sale of his family's house to begin addressing the financial consequences of his offense, and his ability to obtain and maintain gainful employment notwithstanding this case.

The Presentence Report and the Government's sentencing memorandum set forth detailed descriptions of Mr. Globensky's offense, much of which came from information Mr. Globensky gave to the Government, but they do not provide as much detail regarding his proactive cooperation in this case and in other, related investigations regarding the sale of stolen goods from Augusta National.

Mr. Globensky did far more than simply "provide information about those to whom he sold the items and engage in recorded conversations." (Probation's Sentencing Recommendation, p. 2). As detailed below, over the course of several months, Mr. Globensky essentially worked "undercover" for the Government in its investigation into Individual 1 and Business 1, who have long been suspected by Augusta National of selling stolen or unauthorized merchandise and memorabilia.

2

Mr. Globensky's cooperation included multiple interviews with the Government, engaging in frequent phone calls and text messages with Individual 1 to set up a controlled transaction involving stolen merchandise and memorabilia, and providing the Government with hundreds of pages of messages with Individual 1. Mr. Globensky spent countless hours with the agents during their investigation.

For his part, Mr. Globensky was successful—he was able to arrange a controlled sale of stolen merchandise with Individual 1, obtain multiple statements from Individual 1 reflecting Individual 1's knowledge that the goods were stolen, and assist the Government in recovering at least one of the memorabilia items he previously sold Individual 1. It also appears that Mr. Globensky's cooperation with the Government's investigation has forced Business 1 and Individual 1 to unwind previous transactions involving stolen goods from this case. Hopefully, Mr. Globensky's cooperation will help Augusta National recover additional items.

While Mr. Globensky's cooperation has not resulted in any arrests or charges of the individuals and businesses that he worked with, his efforts demonstrate an acceptance of responsibility beyond simply pleading guilty. We also agree with the Probation Officer's opinion that Mr. Globensky selling his house and paying the proceeds towards restitution reflects "exceptional acceptance of responsibility." These facts reflect his capacity for redemption too, as does Mr. Globensky obtaining full-time employment since being charged in this case.

Both the Probation Officer and the Government agree that the Court should sentence Mr. Globensky below the Guidelines range, citing Mr. Globensky's cooperation with the Government's investigations and his early payment towards restitution. The Government has requested a 16-month prison sentence in this case. The Probation Officer has recommended 12 months.

We agree that a downward variance is warranted but respectfully contend that a non-custodial sentence is appropriate in this case and that sentencing Mr. Globensky to prison would be "greater than necessary" under § 3553(a). Under these circumstances, we believe Mr. Globensky should be sentenced to probation.

## OBJECTIONS TO THE PSR

The Probation Office has prepared a Presentence Investigation Report (PSR) in this case calculating a total offense level of 17 and criminal history score of I, resulting in an Advisory Guidelines range of 24 months to 30 months in prison.

Mr. Globensky does not have any objections to the PSR's calculation of the Guidelines in this case but does seek to clarify a few provisions of the PSR. First, regarding Paragraph 9, to the extent it suggests that Mr. Globensky was involved in conducting "audits" of the merchandise at Augusta National, Mr. Globensky was not involved in conducting any audits. While Mr. Globensky was aware of the audits, and thus knew how much merchandise he could take without detection, he did not influence any audits or manipulate any inventory during his offense.

4

Regarding the LLC that Mr. Globensky set up, referenced in Paragraph 12, we note that Mr. Globensky did not set this company up until 2020, and it only received one payment towards the end of the offense. Moreover, Mr. Globensky did not begin stealing historical items from the warehouse until 2011. (PSR ¶ 16).

Finally, though critically, while Mr. Globensky was able to commit his theft offense based on his employment at Augusta National, we note that he never had access to the vaults where historical memorabilia was kept, and which are under constant surveillance, without prior authorization and supervision. In other words, taking these items from the warehouse did not involve trespassing in any areas that Mr. Globensky was not authorized to be in—Mr. Globensky did not break into the vaults and take memorabilia or engage in any sophisticated scheme to steal items from the warehouse. Rather, as explained in more detail below, Mr. Globensky's offense was one of access and opportunity.

## SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

While the PSR has accurately calculated the Advisory Guidelines range, we respectfully contend that a significant downward variance is warranted in this case under 18 U.S.C. § 3553(a) and that a non-custodial sentence is warranted.

Under § 3553(a), the Court must consider factors beyond the Advisory Guidelines to impose a sentence that is "sufficient, but not greater than necessary," based on: (1) the nature and circumstances of the offense; (2) the history and

characteristics of the defendant; (3) the need to avoid unwarranted sentencing disparities; and (4) the need to provide restitution to any victims.

## I.    **Nature of the Offense**

Mr. Globensky acknowledges he has committed a serious offense, one that was driven first by poor judgment, then greed. As in any criminal case, however, there are mitigating aspects to Mr. Globensky's offense. Mr. Globensky began working at Augusta National when he was 24 years old. For most of his time there, including during his offense, he was a hardworking and productive employee.

To increase demand for its merchandise, Augusta National limits the sale of merchandise during the Master's Tournament and directs its warehouse employees to destroy surplus merchandise after the tournament. Employees were permitted to purchase limited amounts of merchandise for a discount but were discouraged from reselling it. While unauthorized, it was also routine for employees to take a small number of items, often for themselves, friends, or family, without paying.

Mr. Globensky, like many warehouse workers at Augusta National, took some surplus merchandise without permission. Eventually, he saw an opportunity to take a greater quantity of merchandise and sell it. When he met Individual 1, the owner of Business 1 and a sophisticated dealer in the sports memorabilia market, he took it. From there, Mr. Globensky's offense snowballed, and he later began taking merchandise before the tournament, when it was not yet available for sale.

Spurred on by Individual 1, who offered Mr. Globensky significant sums of money for the stolen merchandise, Mr. Globensky continued stealing merchandise from the warehouse in increasing quantities until he left Augusta National in 2021. Mr. Globensky will likely be paying for these mistakes, literally and figuratively, for the rest of his life.

Of course, what has drawn the most attention to this case is Mr. Globensky's theft of sports memorabilia related to the Master's Tournament, including green jackets that are awarded to tournament champions (though held by Augusta National). Critically, however, Mr. Globensky's offense never involved stealing these items directly from the secured vaults where they were kept.

At various times at Augusta National, including during renovations of the warehouse, merchandise and memorabilia was strewn throughout different parts of the warehouse. Surplus merchandise slated for destruction, for example, would be placed in a "destroy pile" awaiting destruction. There were other piles throughout the warehouse where memorabilia and other items were temporarily placed.

Occasionally, memorabilia would sometimes end up in the wrong pile, whether due to an accident or because they were taken and left there by someone who had access to the vaults. While Mr. Globensky recognized that these items clearly should not have been in the destroy piles, and that he should have alerted supervisors to the issue immediately, he took them instead. He then sold these

items to Individual 1, who knew they were stolen and would resell the items at extraordinary mark-ups. Regarding one of the green jackets, for example, Mr. Globensky found a box in the destroy pile that contained a green jacket awarded to Arnold Palmer, a famous golfer. Mr. Globensky sold the jacket to Individual 1 for $50,000. The jacket was later sold for around $4 million.

Finally, just as it is an aggravating factor when a defendant has caused harm to a "vulnerable victim," Mr. Globensky's theft, while significant, fortunately did not financially cripple Augusta National, which continued earning record profits and growth throughout the time of Mr. Globensky's employment there. As noted, Mr. Globensky was only able to engage in his offense for so long because he stole merchandise below Augusta National's "shrink rate," meaning he only stole products that he knew would not sell out and therefore be destroyed.[1] In either event, Mr. Globensky will be paying Augusta National back for the rest of his life.

## II.    History and Characteristics of the Defendant

We respectfully contend that Mr. Globensky's history and characteristics strongly weigh in favor of a non-custodial sentence in this case. These factors are reflected both in Mr. Globensky's actions to redeem himself since his offense,

---

[1] Given the complexities in determining an "actual loss" to Augusta National in this case, the parties agreed to a loss amount and restitution based primarily on Mr. Globensky's gain from selling the stolen merchandise while reflecting that goods stolen *after* the tournament, when they were formally slated for destruction, did not cause ANGC any actual loss.

including his cooperation and early payments towards restitution, and in the several letters submitted to the Court by friends, family, and other members of Mr. Globensky's community.[2] We respectfully submit that these facts provide a more accurate view of Mr. Globensky's character than his participation in this offense.

Mr. Globensky's cooperation in this case effectively began when federal agents knocked on his door on August 30, 2022, following their recovery of the Arnold Palmer jacket that Mr. Globensky had sold to Individual 1. While he did not give the agents all the details of his offense at that time, preferring to retain a lawyer first, Mr. Globensky did admit to taking and selling the green jacket.

The agents told Mr. Globensky that he was not the main target of their investigation and offered him an opportunity to cooperate against Individual 1 and Business 1, the "bigger animal" and target that the Government believed was heavily involved in the sale of stolen sports memorabilia.

Shortly after this meeting, Mr. Globensky and undersigned counsel flew to Chicago for an interview with the Government. During this lengthy interview, Mr. Globensky broke down the details of his offense, the inner workings of Augusta National, and the nature of Individual 1's business. Reflecting his genuine remorse, Mr. Globensky broke down at one point while describing how he had betrayed the

---

[2] Due to repeated efforts by the media to contact Mr. Globensky and his family, the names and contact information for these individuals have been redacted. Counsel will provide unredacted copies to the Court and the Government.

trust of Augusta National. He also submitted extensive records, including over 500 pages of text messages with Individual 1, bank records, tax statements, and other materials to account for his entire offense, try to help Augusta National recover the memorabilia he had stolen, and assist the Government's related investigations.

What stands out the most from Mr. Globensky's case, however, is his proactive cooperation with the Government's investigation into Individual 1 and Business 1. This cooperation was extensive, including going "undercover" to engage Individual 1 in multiple recorded phone calls and text messages, and ultimately culminating in setting up a controlled transaction where Individual 1 agreed to meet Mr. Globensky to purchase more stolen merchandise. This was not an easy feat, since Individual 1 knew that Mr. Globensky had not been working at Augusta National since early 2021.

Not only did Mr. Globensky do everything the agents asked of him, but he went above and beyond by getting Individual 1 to explicitly acknowledge that he knew the merchandise was stolen from Augusta National during this controlled transaction, after which Individual 1 headed back to Florida with the merchandise in a truck. During the controlled transaction, Mr. Globensky was also able to recover one of the historic items he had stolen and given to Individual 1 to hold. When Individual 1 became aware that agents intercepted his truck, he called Mr. Globensky, and the two discussed "sticking with our story."

While Mr. Globensky's cooperation against Business 1 and Individual 1 has not resulted in an arrest or prosecution at this time, the Government has confirmed with undersigned counsel that Mr. Globensky did everything asked of him by the Government, and the current lack of charges is not attributable to anything that Mr. Globensky did wrong. At a minimum, it appears Mr. Globensky's assistance may have at least stopped this individual and his business from continuing to traffic in stolen goods, including memorabilia from Augusta National.

In imposing a fair sentence in this case, the Court can and should recognize Mr. Globensky's cooperation based on the substantial assistance he provided the Government and as a metric of his acceptance of responsibility and capacity for redemption. While everyone agrees that Mr. Globensky's cooperation merits a substantial downward variance from the Guidelines, we respectfully contend that, in conjunction with the other factors in this case, Mr. Globensky's cooperation in this case has earned this Court's consideration for a non-custodial sentence.

The Government has moved for a downward variance of "a third" of the low-end Guidelines range, requesting a prison sentence of 16 months, but it is well-established that district courts have sweeping authority to impose sentences below the Government's § 5K1.1 recommendation. *See United States v. Pankow*, 884 F.3d 785, 794 (7th Cir. 2018). The court may do so after considering "the significance and usefulness of the defendant's assistance; the truthfulness,

completeness, and reliability of any information or testimony provided by the defendant; the nature and extent of the defendant's assistance; any injury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance; and the timeliness of the defendant's assistance" under § 5K1.1.

These factors, in this case, weigh in favor of a greater departure than the Government recommends and support a sentence of probation. Mr. Globensky was honest with the Government; he was useful to the Government; his cooperation was proactive, long in duration, and required exercising his own discretion while acting "undercover" during controlled communications and transactions; and his assistance was timely—indeed, Mr. Globensky flew up to Chicago for an interview with the Government soon after agents confronted him despite the sudden death of his first attorney. Whenever the agents needed him, Mr. Globensky was there.

Separately from considering a downward departure under § 5K1.1, which depends on evaluating only the quality of the defendant's "substantial assistance" to the Government, the Court can also consider Mr. Globensky's cooperation for a different purpose—as a measure of his acceptance of responsibility and capacity for redemption. *See United States v. Leiskunas*, 656 F.3d 732, 737 (7th. Cir. 2011), holding courts "may consider a defendant's cooperation with the government as a basis for a reduced sentence, even if the government has not made a § 5K1.1 or Rule 35 motion"; *United States v. Blue*, 453 F.3d 948, 954 (7th Cir. 2006).

Whether as a function of granting a downward departure under § 5K1.1 or a downward variance under § 3553(a), Mr. Globensky's cooperation in this case warrants a non-custodial sentence. While Mr. Globensky cannot take back his offense, he has responded in precisely the way our society hopes that people will respond when confronted with their wrongdoing—he owned up to his offense and dedicated himself to helping right his wrongs, including selling his house to make a significant payment towards restitution, despite having no obligation to do so.

Wholly apart from Mr. Globensky's cooperation is his background and character. Notwithstanding this offense, Mr. Globensky is a man of good character who has a proven track record of working hard to support his family and helping others in need. That is reflected in the letters before the Court.

These letters reflect Mr. Globensky's best qualities—he has always been known by others as a generous, hardworking individual. The letters also reflect how incredibly remorseful, how "*truly humbled*" Mr. Globensky is for his participation in this offense, which has brought enormous negative attention to his family—living in Augusta when this case became public, Mr. Globensky has had to remove his children from school due to bullying. (Exhibit 2, Letter from DTB).

To be sure, Mr. Globensky's offense, like virtually all theft offenses, was driven by greed, and the Government is right that Mr. Globensky spent the money he made living well above his means. It is also true, however, that Mr. Globensky

has a history of leadership and generosity in his community—the letters discuss how he has helped family members overcome addiction, how he opened his house to extended family and their friends when they had to evacuate their homes due to a hurricane, how he has ensured that his adopted son has a meaningful relationship with his birth father, and how he has served his community, including as a home owner's association president. On one occasion, Mr. Globensky saved his nephew from drowning by acting quickly. Mr. Globensky's first instincts are to help others.

In addition to reciting the various ways Mr. Globensky helps his family and his community, Mr. Globensky's wife writes about how Mr. Globensky reached out to his biological son, M.P., who was adopted as a baby due to Mr. Globensky's youth at the time of M.P.'s birth. While many people would shy away from that kind of contact, Mr. Globensky made sure his son knew that "while they didn't have a relationship during his youth, that it was never because there was a lack of yearning for that connection or a lack of love." (Exhibit 1, Letter from MG).

In part based on Mr. Globensky's guidance, M.P. is now a successful man with his own, large family. He has even made Mr. Globensky a grandfather. M.P. describes feeling like "one of the lucky ones"—an adopted child who got to meet his birth father. In Mr. Globensky, he gained a "role model." (Exhibit 3, Letter from MP). The authors of these letters have all grappled with Mr. Globensky's offense and concluded that Mr. Globensky's offense does not reflect his character.

The letters also discuss how Mr. Globensky has been able to obtain gainful full-time employment "*when he was at his lowest*," despite the obstacles he has faced due to pleading guilty to in a high-profile theft case and the notoriety that has come with it. (Exhibit 2). This job has allowed Mr. Globensky to move his family out of his mother-in-law's home, into a modest apartment, and continue supporting them. Mr. Globensky's employer rigorously vetted him before deciding that he was worthy of a second chance. Mr. Globensky and those who submit letters on his behalf are asking this Court to do the same.

### III.    Need to Avoid Unwarranted Sentencing Disparities

In determining a reasonable sentence, district courts must also consider the need to avoid unwarranted sentencing disparities among similarly situated defendants. In this case, a sentence of probation would be consistent with how other defendants like Mr. Globensky have been sentenced.

According to the U.S. Sentencing Commission's Judiciary Sentencing INformation (JSIN), an interactive tool for researching federal sentencing statistics, defendants with Mr. Globensky's offense level under § 2B1.1 and criminal history score received probation in 26% of the cases from 2019 through 2023.[3] Notably, these statistics *exclude* the 22% of cases, like this one, where the Government has moved for a reduction under § 5K1.1 based on the defendant's cooperation.

---

[3] https://www.ussc.gov/guidelines/judiciary-sentencing-information



While the comparisons are not perfectly on point, this Court can also look at other cases involving Augusta National and the sale of stolen memorabilia, including the famous green jackets. In 2013, for example, Augusta National sued an auction house in Texas regarding its attempts to sell a green jacket that had been stolen by employees at Augusta National. This was not the first time the auction house had been accused of selling stolen memorabilia.[4] In another civil case, Augusta National sued a "golf memorabilia company" in 2017 to stop it from selling multiple green jackets and other memorabilia that was obviously stolen.[5]

---

[4] David Lee. Masters Host Says Green Jacket was Stolen. Courthouse News Service. February 19, 2023. https://www.courthousenews.com/masters-host-says-green-jacket-was-stolen/

[5] Associated Press. Augusta National sues Tampa company to stop auction of green jackets. Tampa Bay Times. August 14, 2017. https://www.tampabay.com/news/courts/civil/augusta-national-sues-tampa-company-to-stop-auction-of-green-jackets/2333754/

Mr. Globensky was not involved in the theft of any of the items referenced in these articles, and he has no knowledge regarding their alleged theft. It does not appear the federal government assisted Augusta National in these cases, and undersigned counsel is not aware of any other cases where the federal government has been enlisted to assist Augusta National in recovering stolen memorabilia or investigate other employees who have stolen from Augusta National. The auction company defendants in these civil cases only ever faced financial penalties, never jail time, and it does not appear that the employees who stole memorabilia from Augusta National and sold it to them did either.

While Mr. Globensky's offense may be distinguishable due to the scope and duration of the offense, imposing a term of probation is a significant punishment that will sufficiently account for his role in the offense and distinguish his sentence from the outcomes of these civil cases involving the theft and sale of Augusta National memorabilia. *See Gall v. United States*, 552 U.S. 38, 59 (2007), noting that defendants on probation are "subject to several standard conditions that substantially restrict their liberty"; *United States v. Cole*, 765 F.3d 884, 886 (8th Cir. 2014), affirming probation sentence based on the "lifelong restrictions" the defendant would face as a convicted felon and finding that probation would decrease the risk of recidivism given the defendant's ability to work. Even in this high-profile case, probation would be consistent with federal sentencing trends.

## IV.    <u>Need to Provide Restitution</u>

Finally, the Court must consider the need for the sentence imposed to provide restitution to the victims of the offense. That means weighing any interests in incarceration against the defendant's need to generate income to satisfy any restitution obligations. *See United States v. Edwards*, 59 F.3d 1004, 1016-17 (9th Cir. 2010), affirming probation sentence, finding that a felony conviction was sufficient to deter the defendant from future crimes and that probation "would best accomplish the goals of the restitution order" by allowing the defendant to work; *United States v. Menyweather*, 447 F.3d 625, 634 (9th Cir. 2006), observing that the "goal of obtaining restitution for the victims of Defendant's offense…is better served by a non-incarcerated and employed defendant."

While the need to provide restitution does not merit a non-custodial sentence in every case, it does in this one. Despite selling his house and forfeiting virtually all of the proceeds of the sale to the Government, Mr. Globensky will still owe at least $3.7 million in financial penalties, regardless of the sentence this Court imposes. And because the Government has not charged Individual 1 or Business 1, it appears Mr. Globensky alone will be responsible for the entire restitution order.

The Government contends that a prison sentence is warranted, citing Mr. Globensky's spending on luxurious purchases. These purchases were certainly problematic. That said, we respectfully submit that a $5-million forfeiture order

and $3-million restitution obligation, which will require Mr. Globensky to pay it all back and more, is sufficient punishment when coupled with a felony conviction and a term of supervision under strict conditions of probation.

After much struggle, Mr. Globensky has found full-time employment which will allow him to continue meeting his financial obligations for restitution and forfeiture. If he is sentenced to prison, he will have to start all over, and a custodial sentence will make it significantly harder for him to meet those obligations. Notably, neither the Government nor the Probation Officer's recommendations for a downward variance account for the need for Mr. Globensky to be able to satisfy his restitution obligations under § 3553(a).

Accordingly, Mr. Globensky asks that this Court sentence him to probation, not only to spare him from prison or to spare his family from being deprived of their main source of support, but so that Mr. Globensky can continue to work and make things right. Sending Mr. Globensky to prison at this juncture would not serve society or further any societal interest. Incarceration would only hinder Mr. Globensky's ability to pay restitution and contribute to his community.

## **CONCLUSION**

For these reasons, we respectfully contend that a probation sentence is warranted and that a term of imprisonment, under these circumstances, would be "greater than necessary" to further the goals of federal sentencing.

This 5th day of March, 2025.

THE CHURCH LAW FIRM, LLC

The Church Law Firm, LLC
101 Marietta Street NW
Suite 3300
Atlanta, Georgia 30303
(404) 223-3310
tom@church.law

/s/ Thomas D. Church
Thomas D. Church
Georgia Bar No.: 956589

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this day electronically filed the foregoing using the CM/ECF system which will automatically send email notification of such filing to all counsel of record in this matter.

This 5th day of March, 2025.

THE CHURCH LAW FIRM, LLC

The Church Law Firm, LLC
101 Marietta Street NW
Suite 3300
Atlanta, Georgia 30303
(404) 223-3310
tom@church.law

/s/ Thomas D. Church
Thomas D. Church
Georgia Bar No.: 956589